## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

NOVIPAX HOLDINGS LLC and  )
NOVIPAX LLC,  )
            )
          Plaintiffs,  )
            )
          v.  )
            )   C.A. No.: N17C-03-1682 EMD CCLD
SEALED AIR CORPORATION,  )
CRYOVAC, INC., SEALED AIR  )
CORPORATION (US), and SEALED AIR  )
(CANADA) CO./CIE,  )
            )
          Defendants.  )
            )

Submitted: September 25, 2017
Decided: November 28, 2017

*Upon Defendants' Motion to Dismiss*
***DENIED***

Jeffrey Moyer, Esquire, Richard P. Rollo, Esquire, Travis S. Hunter, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware and Robert M. Hoffman, Esquire, Michael J. Chiusano, Esquire, James C. Bookhout, Esquire, Andrews Kurth Kenyon LLP, Dallas, Texas. *Attorneys for Novipax Holdings LLC and Novipax LLC.*

Kenneth J. Nachbar, Esquire, John P. DiTomo, Esquire, Barnaby Grzaslewicz, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Robin L. Cohen, Natasha Romagnoli, Esquire, McKool Smith P.C., New York, New York. *Attorneys for Sealed Air Corporation, Cryovac, Inc., Sealed Air Corporation (US), and Sealed Air (Canada) Co./CIE.*

## I.  INTRODUCTION

This breach of contract and fraud case is assigned to the Complex Commercial Litigation Division of this Court. This civil action arises out of a sale and purchase of a North American foam tray and absorbent pad business. Plaintiffs Novipax Holdings LLC and Novipax LLC (collectively, "Novipax"), the purchasers, allege that Defendants Sealed Air Corporation, Cryovac, Inc., Sealed Air Corporation (US), and Sealed Air (Canada) (collectively, "Sealed Air") intentionally misled and induced Novipax to purchase the business based on omissions,

concealments, and material misrepresentations. Novipax now brings an action against Sealed Air. Through a complaint filed on or about March 31, 2017 (the "Complaint"), Novipax asserts claims for: Fraud, Fraudulent Inducement, and Willful or Intentional Misrepresentations (Count I), Breach of Asset Purchase Agreement (Count II); Breach of Transition Services Agreement (Count III); Declaratory Judgment and Setoff (Count IV); and Unjust Enrichment (Count V).

Sealed Air has filed its Motion to Dismiss (the "Motion to Dismiss"). Through the Motion to Dismiss, Sealed moves to dismiss Counts I-V for failure to state a claim upon which can be granted. For the reasons set forth below, the Court will **DENY** the Motion to Dismiss.

## II. RELEVANT FACTS[1]

### A. THE FOAM TRAY AND ABSORBENT PAD INDUSTRY

According to the Complaint, there are two types of foam trays in the industry—barrier and non-barrier foam trays.[2] Barrier foam trays provide an airtight package that extends the shelf life of meat, poultry, seafood, and other protein products.[3] Barrier foam trays are sold to processors, who then package the food in the barrier foam trays and sell the packaged food to retail outlets like Walmart.[4] Non-barrier foam trays are more of a "commodity product sold directly to customers for over-wrapped applications."[5]

---

[1] Unless otherwise indicated, the following are the Relevant Facts as alleged in the Complaint. For purposes of the Motion to Dismiss, the Court must view all well-pleaded facts alleged in the Complaint as true and in a light most favorable to Novipax. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, C.A. No. 09C-09-136, 2010 WL 5825343, at *3(Del. Super. Oct. 27, 2010).

[2] Compl. ¶ 24.

[3] *Id.* ¶ 25.

[4] *Id.* ¶ 26.

[5] *Id.* ¶ 27.

Absorbent pads are used in conjunction with both barrier and non-barrier foam trays.[6] Absorbent pads are designed to absorb product fluids in order to create a more attractive presentation of the product to consumers.[7]

## B. SEALED AIR SELLS ITS BARRIER FOAM TRAY AND PAD BUSINESS

Sealed Air owned and operated a food tray business that sold rigid trays, foam trays, and absorbent pads to food handlers and processors.[8] In 2013, Sealed Air attempted to sell its foam tray and pads business, which at that time included European and South American assets.[9] During the initial sale process, Sealed Air was purportedly receiving bids of over $300 million.[10] Sealed Air, however, was unable to close a sale at that price.[11]

In the summer of 2014, Sealed Air initiated a second sale process, this time for the North American assets only.[12] Sealed Air sought to sell its North American foam tray and pads business, but not its rigid tray business.[13] On September 16, 2014, Novipax bid $152.5 million for the foam tray and pad business (the "Business").

Sealed Air conducted its first management presentation to Novipax on October 21, 2014.[14] At this meeting, Sealed Air disclosed to Novipax that the Business's largest customer, Tyson, might demand a price concession in order to continue purchasing foam trays and pads.[15] Sealed Air therefore asked all remaining bidders, including Novipax, for new bids reflecting the

---

[6] *Id.* ¶ 28.
[7] *Id.*
[8] *Id.* ¶ 3.
[9] *Id.* ¶ 41.
[10] *Id.*
[11] *Id.*
[12] *Id.* ¶ 42.
[13] *Id.* ¶ 4.
[14] *Id.* ¶ 44.
[15] *Id.*

valuation impact of Tyson's demand.[16]  On November 4, 2014, Novipax reduced its bid to $80 million.

On February 11, 2015, Novipax and Sealed Air entered into an Asset Purchase Agreement (the "APA") for the Business.[17]   Novipax and Sealed Air also executed a Transition Services Agreement (the "TSA").  Novipax closed its purchase of the Business on April 1, 2015 (the "Closing").[18]

## C.    THE APA

The APA defines the parties as: (i) Sealed Air Corporation, referred to as the "Parent"; (ii) Cryovac, Inc., (iii) Sealed Air Corporation (US), and (iv) Sealed Air Corporation (Canada), referred to with the Parent as the "Sellers"; and (iii) DankPak LLC[19], referred to as the "Buyer." For internal consistency, unless quoting the language of the APA, the Court will refer to the "Sellers" as "Sealed Air," and the Court will refer to the "Buyer" as Novipax.

As part of the sale and purchase of the Business, the APA imposes certain disclosure duties and alike on Sealed Air and Novipax.  This includes representations and warranties and affirmative and negative covenants.

### i.    *Sealed Air's Representations and Warranties*

Article IV of the APA specifies Sealed Air's representations and warranties.[20]  Section 4.5 requires Sealed Air to represent and warrant about changes related to the Business.[21]  Under Section 4.5, Sealed Air represents and warrants that:

---

[16] *Id.* ¶ 45.

[17] *Id.* ¶ 19.

[18] *Id.* ¶ 20.

[19] DankPak LLC was the former name of Novipax Holdings LLC, the holding company for the other Novipax entity. *See* Compl. Ex. A. Asset Purchase Agreement p. 1. Exhibit A to the Complaint will be cited to as "APA § __" or "APA p. __" if no section is specified.

[20] *See* APA Art. IV.

[21] *Id.* § 4.5.

(a) there has not been any Material Adverse Effect, (b) the Business has been operated in the Ordinary Course in all material respects . . . (d) except as set forth on Section 4.5 of the Disclosure Schedule, there has not been any action by any Seller that, if taken during the period from the date of this Agreement through the Closing Date, would constitute a breach of Section 6.1(a), (f), (g), (i), or (l).[22]

Material Adverse Effect is defined as "any change, event, circumstance, condition, or effect that is materially adverse to . . . (ii) the condition (financial or otherwise), assets, business, operations, or results of operations of the Business."[23] Ordinary Course is defined as the ordinary and usual course of normal day-to-day operations consistent with past practice.[24]

Section 4.6(b) requires Sealed Air to represent and warrant regarding possible changes to certain Material Contracts.[25] Under Section 4.6(b), Sealed Air represents and warrants that:

There is not any existing material default or event of material default, or any event which, with or without notice or lapse or time or both, would constitute a material default under any Material Contract by any Seller, or, to the Knowledge of Parent, by any other party thereto. No Seller has received any notice of the intention of any party to terminate any such Material Contract.[26]

The Material Contracts are listed in Section 4.6(a) to the Disclosure Schedule and include the supply agreements with certain customers of the Business such as Tyson, Perdue, and Cargill.[27]

Section 4.7 then requires Sealed Air to represent and warrant about Purchased Assets, specifically that the Purchased Assets "constitute the rights, assets, and services required to conduct the Business following the Closing."[28] Purchased Assets include tangible and intangible assets of the Business, including Sealed Air's goodwill.[29]

---

[22] *Id.*
[23] *Id.* p. 9.
[24] *Id.* p. 10.
[25] *Id.* § 4.6.
[26] *Id.*
[27] *Id.* § 4.6 to the Disclosure Schedule.
[28] *Id.* § 4.7.
[29] *Id.* p. 11.

5

Finally, Section 4.18 requires Sealed Air to make certain representations related to the Business's Major Customers.[30] Under Section 4.18, Sealed Air represents and warrants that "in the last 12 months, no Major Customer has provided written notice to Sellers of its intention to terminate its relationship with any Seller with respect to the Business, whether as a result of the Transaction or otherwise."[31] The Major Customers are the ten largest customers of the Business (in terms of dollar volume of purchases from Sellers) and are defined on Section 4.18 of the Disclosure Schedule and include Tyson, Perdue, and Cargill.[32]

Article IV of the APA concludes by providing a disclaimer about Sealed Air's representations and warranties—that neither Sealed Air nor any of its representatives or alike made any other representation or warranty, express or implied, other than those provided in Article IV.[33]

### ii   Novipax's Representations and Warranties

Article V of the APA sets forth Novipax's representations and warranties.[34] Under Section 5.7, Novipax must represent and warrant that it has conducted a financial investigation of the Business, which includes Novipax's "own estimate of the value of the Business and the Purchased Assets.[35] Section 5.7 also requires Novipax to represent and warrant that:

> Buyer has received certain estimates, budges, forecasts, plans and financial projections (collectively, "Forward Looking Statements"). There are uncertainties inherent in the Forward Looking Statements, and Buyer is familiar with such uncertainties. Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Forward Looking Statements (including the reasonableness of the assumptions underlying the Forward Looking Statements).[36]

---

[30] *Id.* § 4.18.
[31] *Id.*
[32] *See* § 4.18 of Disclosure Schedule.
[33] *Id.* § 4.20.
[34] *See id.* Art. V.
[35] *Id.* § 5.7
[36] *Id.*

6

Section 5.7 also required Novipax to represent and warrant that:

> Buyer is not relying on any representations, warranties, omission or covenants of Sellers or any of their Representatives (including any financial statements not expressly covered in Section 4.4, any projections, and the information contained in the confidential information memorandum, management presentation and other due diligence materials made available to Buyer) except as expressly set forth in this Agreement and any Seller Related Agreement executed and delivered to any Buyer Party pursuant to this Agreement.[37]

### iii  The Covenants

Article VI of the APA places certain affirmative and negative covenants on the parties before the Closing.[38]  As it related to Sealed Air's operation of the Business, Section 6.1 states that:

> Sellers shall conduct the Business in all material respects in the Ordinary Course and, to such extent, use reasonable best efforts to preserve intact its current business organization and the goodwill of the Business . . . maintain its existing relationships with customers, suppliers, vendors, distributors, agents . . . including the Major Customers and Major Suppliers . . . Sellers shall maintain all of the Purchased Assets in their current condition, ordinary wear and tear excepted.[39]

Section 6.1 further places negative covenants on Sealed Air's operation of the Business:

> Sellers shall not do any of the following with respect to the Business without the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned, or delayed):
>
> (a) breach any material obligation or duty imposed upon a Seller by any applicable Law;
>
> (b) except in the Ordinary Course, make any purchase, sale, or disposition of any Purchased Asset
>
> (c) except in the Ordinary Course, (i) amend or terminate any Assumed Contract or (ii) materially amend or terminate any material business arrangements[40]

---

[37] *Id.* § 5.7.
[38] *See id.* Art. VI.
[39] *Id.* § 6.1.
[40] *Id.* § 6.1 (a)-(c).

Section 6.3(b) then places affirmative duties on Sealed Air and Novipax related to party communications.[41] Section 6.3 states that:

> Parent and Buyer shall give written notice to the other promptly upon becoming aware of (i) any representation or warranty contained in this Agreement becoming untrue or (ii) the failure of any party to comply with or satisfy in any respect any covenant, condition, or agreement to be complied with or satisfied by it under this Agreement.[42]

Article VII makes compliance with the foregoing representations, warranties and covenants a condition precedent to the Closing.[43] Sections 7.2 and 7.3 state that the obligations of Novipax and Sealed Air to effect the Closing shall be subject to the fulfillment of the representations, warranties, and covenants contained in the Agreement.[44]

### iv. Indemnification Rights

Article IX provides indemnification rights to Sealed Air and Novipax.[45] Under Sections 9.1 and 9.2, Sealed Air and Novipax are entitled to indemnification for all losses arising from breach of any representation or warranty or breach or non-fulfillment of any covenant in the APA.[46] Section 9.3, however, places limits on these indemnification rights.[47] Section 9.3(b) requires the indemnifying party to receive notice of the indemnification claim within certain timeframes:

> A party otherwise liable for indemnification under this Article IX (an "Indemnifying Party") shall have no liability for and Indemnification Claim under Section 9.1(a) or 9.2(a) unless such Indemnifying Party shall have received a Claim Notice with respect thereto on or before the following applicable deadline: (A) for a claim relating to a Core Representation or a claim that involves fraud, at any time after Closing . . . (C) for any other claim, the eighteen (18) month anniversary of the Closing Date.[48]

---

[41] *Id.* § 6.3(b).
[42] *Id.*
[43] *See id.* Art. VII.
[44] *Id.* §§ 7.2(a)-(b), 7.3(a)-(b).
[45] *See id.* Art. IX.
[46] *Id.* §§ 9.1(a)-(b), 9.2(a)-(b).
[47] *Id.* § 9.3.
[48] *Id.* § 9.3(a).

Section 9.3(h) then provides that:

> From and after the Closing, the indemnification rights provided by this Article IX shall constitute the sole and exclusive remedy of the Indemnified Parties for any breach of representation, warranties, covenants, or agreements contained in this Agreement or any Closing Instrument; provided, however, that nothing herein shall limit (i) any claim based on fraud, willful misrepresentation or willful breach, or (ii) any party's right to seek specific performance, injunctive relief, or other equitable remedies.[49]

Finally, Article X, Section 10.3 affirms that the APA and the other instruments and agreements contemplated by the APA "constitute the entire agreement amount the parties and supersede any prior understanding, agreement, or representations by or among the parties.[50]

## D. THE TSA

Novipax and Sealed Air executed the TSA concurrently with the APA. The only parties to the TSA are Sealed Air Corporation and Novipax LLC.

The TSA specifies certain transition services that Sealed Air must provide to Novipax following the Closing.[51] For example, Service Schedule 1, A requires Sealed Air to work to maintain its relationship with customers of the Business as of the Closing.[52] In addition, Service Schedule 1, B requires Sealed Air to provide sales administration support for: (i) formula pricing for U.S. customers, and (ii) U.S. barrier foam tray pricing and rebate management.[53]

In the event of a dispute or an alleged breach of the TSA, the parties agreed under Section 5.15 to engage in good faith negotiations to resolve the dispute.[54] Specifically, Section 5.15 provides that:

---

[49] *Id.* § 9.3(h).
[50] *Id.* § 10.3.
[51] *See* Compl. Ex. B, Transition Services Agreement p. 1. Exhibit B to the Complaint will be cited to as "TSA § __", "TSA Sch. __", or "TSA p. __" if no section is specified.
[52] TSA Serv. Sch. 1, A.
[53] *Id.* Serv. Sch. 1, B.
[54] *Id.* § 5.15.

9

In the event of a dispute or alleged breach of the Agreement by either Party, the Parties agree to engage in a good faith effort and negotiation in an attempt to resolve the dispute or alleged breach. In the event that this initial negotiation is not successful, the parties agree to elevate the dispute or alleged breach to the executive level of each Party, and the senior executives of each Party agree to negotiate in good faith and attempt to arrive at a mutual resolution of such dispute or alleged breach. In the event that this discussion is unable to resolve the controversy within a reasonable period of time, the Parties may then pursue their respective remedies pursuant to applicable Law and in accordance with Section 10.6 of the [APA].[55]

## E. NOVIPAX MAKES CERTAIN DISCOVERIES AFTER CLOSING

Following the Closing, Sealed Air gave Novipax access to its pre-acquisition e-mails pursuant to the terms of the APA and the TSA.[56] Through such e-mails, Novipax contends that it discovered various representations and discussion about the Business that were contrary to the representations in the APA.[57]

### i. *Sealed Air failed to disclose material information about the Business*

Novipax claims that Sealed Air knew of material information relevant to the value of the Business but failed to disclose it to Novipax.[58] Specifically, Novipax alleges that Sealed Air knew that: (i) major customers were migrating, or preparing to migrate, to rigid trays; (ii) barrier foam trays were not cost advantaged relative to rigid trays; and (iii) the cost for customers to shift from barrier foam trays to rigid trays was *de minimus*.[59]

In early December 2014, Bimal Kalvania (VP & GM Rigids & Absorbents) sent an e-mail to others at Sealed Air chastising them for working to switch Cargill (one of its clients) from foam trays to rigid trays, stating, "it will confirm their worst fears that [foam] is changing to [rigid] . . . we can expect buyers to walk away or deeply discount the valuation/price for the

---

[55] *Id.*
[56] Compl. ¶ 1; *see also* APA § 6.4(b).
[57] Compl. ¶ 5.
[58] *Id.* ¶ 47.
[59] *Id.*

10

business."[60] In another e-mail, Sealed Air decided to withhold information about then on-going customer negotiations with Cargill for a 2% foam tray price reduction because disclosing it "could put the deal at risk."[61]

### ii. Sealed Air concealed material information about the Business

Novipax also alleges that Sealed Air concealed material information about the Business, mainly the Business's customer base.[62] While Sealed Air disclosed Tyson's demand for a price reduction, Sealed Air purportedly concealed facts undermining the value of the Perdue and Cargill businesses.[63]

On March 2, 2015, Perdue advised Sealed Air of its intent to transition its foam business to rigid trays sometime in "the middle of April."[64] In an e-mail dated March 3, 2015, Sealed Air confirmed that it "[l]ooks like Perdue is planning on moving all of its foam trays to a solid barrier rigid tray mid-April."[65] Another e-mail dated March 4, 2015 included a statement from Perdue that orders for two of the barrier foam trays "will taper down beginning the week of March 23rd."[66] Despite acknowledging that this information likely had to be disclosed to Novipax, Sealed Air's in-house counsel claimed there was no "legal obligation" to notify Novipax and left it up to Sealed Air's VP of Global Mergers to inform Novipax.[67] Sealed Air supposedly never notified Novipax.

As noted above, Novipax contends that Sealed Air concealed the potential loss of Cargill before the APA was signed.[68] In Mr. Kalvani's December 14, 2014 e-mail, he instructed sales

---

[60] *Id.* ¶ 48.
[61] *Id.* ¶ 49.
[62] *Id.* ¶¶ 87–89.
[63] *Id.* ¶ 92.
[64] *Id.* ¶ 93
[65] *Id.*
[66] *Id.* ¶ 95.
[67] *Id.* ¶¶ 97–99.
[68] *Id.* ¶ 104.

teams to stop attempting to switch Cargill from soft to rigid trays because it could undermine the transaction with Novipax since the Cargill business "represents more than 33% of barrier trays."[69] Sealed Air also discussed Cargill's request for a 2% price reduction on barrier foam for the next contract cycle based on the fact that the price of rigid trays was becoming competitive with the price of foam trays.[70] In an internal e-mail pertaining to the 2% reduction, Sealed Air's Jackie Anderson stated that it "must disclose anything above $150,000 P&L change to the Business," and confirmed that the Cargill P&L change would have exceeded $300,000.[71] Rather than disclose the facts undermining the value of Cargill, Sealed Air concealed the information to preserve the deal—"having this discussion with [Buyer] could put the deal at risk as we already have difficult conversations about Tyson RFP."[72]

### iii   Sealed Air provided false assurances about the Business

Finally, Novipax alleges that Sealed Air made false assurances about the Business after execution of the APA and before the Closing.[73] First, Sealed Air purportedly misrepresented that the Business constituted a viable, sustainable product line which was protected from competing packaging, including Sealed Air's rigid tray business.[74] In the Confidential Information Memorandum, provided pursuant to Section 6.4 of the APA, Sealed Air stated that "foam will remain the material of choice going forward due to consumer preference, pricing advantages, and the significant capital investment required to upgrade equipment to other resin-based packaging solutions."[75] Sealed Air's management presentation also confirmed that "foam is the resin of

---

[69] *Id.*
[70] *Id.* ¶ 105.
[71] *Id.* ¶ 106.
[72] *Id.* ¶ 109.
[73] *Id.* ¶ 51.
[74] *Id.*
[75] *Id.* ¶ 53.

12

choice," that "switching to rigid trays negatively impacted retailer sales," and that "foam trays are more cost effective than rigid trays."[76]

Novipax discovered numerous e-mails from Sealed Air's Regional Sales Manager Scott Mauer admitting that foam trays were not as cost advantageous as originally believed. Mr. Mauer stated that "to move from foam to solid is not too expensive . . . around $2000-2,500 for a single lane," and that for certain processing machines "no changes are required" to switch from foam to rigid trays.[77] Mr. Mauer also stated that the estimate provided to Novipax of the cost to convert production lines was "significantly high" and "much higher than would actually occur," and acknowledged that he may have "misled the decision" and caused Novipax to believe that "foam barrier trays don't have serious competition."[78]

Second, Novipax alleges that Sealed Air provided the false assurance that it would preserve and protect the value of the Business to be transitioned to Buyer. Novipax contends that Sealed Air breached the representations and warranties under Article IV by migrating the Business's Major Customers to non-Business products, failing to conduct the Business in the Ordinary Course, and amending material business arrangements. Novipax points to the fact that Sealed Air helped transition Perdue from the Business's barrier foam trays to its retained rigid trays. Novipax also argues that Sealed Air knew Cargill planned to perform testing on rigid tray replacement and confirmed that Cargill would use Sealed Air's rigid tray product.

Finally, Novipax contends that Sealed Air provided the false assurance that it would advise Novipax if it breached a representation or covenant between the signing and the Closing pursuant to Section 6.3 of the APA. Instead, in March of 2015, Sealed Air provided notice of

---

[76] *Id.* ¶ 55
[77] *Id.* ¶ 58.
[78] *Id.* ¶¶ 59–63.

certain *de minimus* inaccuracies under Section 6.3, but did not disclose any of the inaccuracies surrounding foam trays and rigid trays, the Business, and the Business's customer base. The closing certificate provided before the Closing did not disclose any of the foregoing inaccuracies or material changes.[79]

## F.    NOVIPAX INITIATES THIS CIVIL ACTION AGAINST SEALED AIR

Based on these discoveries, Novipax filed the Complaint against Sealed Air principally for fraud. The Complaint also asserts claims for breach of the APA and TSA, unjust enrichment, and declaratory judgment.

On May 16, 2017, Sealed Air moved to dismiss Counts I-V and filed Defendants' Opening Brief in Support of Motion to Dismiss. Novipax filed Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss (the "Opposition") on July 21, 2017. On August 15, 2017, Sealed Air filed Defendants' Reply Brief in Further Support of their Motion to Dismiss (the "Reply").

The Court heard argument on the Motion to Dismiss, the Opposition and the Reply on August 25, 2017.  At this hearing, the Court also heard argument on the Motion for a Protective Order to Stay Discovery, filed by Sealed Air and the Opposition to Defendants' Motion for Protection Order and to Stay Discovery, filed by Novipax. By Order dated July 21, 2017, the Court temporarily stayed discovery, but must decide at the hearing whether a further stay is required pending resolution of the Motion to Dismiss.

---

[79] *Id.*

## IV.  PARTIES' CONTENTIONS

### A.    Sealed Air's Contentions

Sealed Air argues that the Complaint must be dismissed in its entirety because Novipax failed to comply with certain contractual prerequisites to litigation.  Sealed Air next contends that the individual claims in Counts I-V fail to state cognizable causes of action.  On the fraud claim, Sealed Air claims that the non-reliance and integration provisions of the APA—Sections 4.20, 5.7, and 10.3—bar Novipax from claiming it relied on extra-contractual representations or warranties.  Sealed Air also argues that the fraud claim is not pleaded with particularity and fails to demonstrate that the damages are separate from the breach of contract damages.  On the breach of contract claims, Sealed Air contends that the Complaint fails to allege any act that constitutes a breach of the APA or the TSA.  On the equitable claims, Sealed Air alleges that the claim for unjust enrichment fails because it arises out of the parties' contractual relationship. Finally, Sealed Air claims that Novipax is not entitled to declaratory judgment negating the APA's requirement with respect to alternative dispute resolution ("ADR").

### B.   Novipax's Contentions

Novipax argues that there are no contractual prerequisites that bar this civil action.  On the fraud claim, Novipax contends that the non-reliance and integration provisions do not unambiguously bar a fraud claim and that Section 9.3(h) in fact expressly permits a fraud claim. Novipax also asserts that the fraud damages are separate from the breach of contract damages. On the breach of contract claim, Novipax claims that the Complaint asserts numerous breaches of the APA, specifically Sections 4.5, 4.18, 6.1, and 6.3(b).  As to the equitable claims, Novipax contends it may bring an unjust enrichment claim as an alternative remedy based on the theory that no contract exists because of Sealed Air's fraud.  Finally, Novipax argues that it is entitled to

15

declaratory judgment as to its right to offset the damages in this suit from the Closing Net Working Capital, and that this determination can only be made by this Court.

## V. STANDARD OF REVIEW

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[80] However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[81]

## V. DISCUSSION

### A. SEALED AIR HAS NOT DEMONSTRATED THAT THERE ARE PROCEDURAL OR TIME BARS THAT REQUIRE DISMISSAL OF THIS CIVIL ACTION IN ITS ENTIRETY

Sealed Air first argues that the lawsuit must be dismissed because Novipax has not complied with certain contractual prerequisites to litigation set forth in the APA and TSA.

#### i. Sealed Air's construction of Article IX of the APA is not the only reasonable construction as a matter of law

Sealed Air first argues that Novipax did not provide appropriate Claim Notice (as defined in the APA) that Sealed Air breached a representation or warranty as required by Section 9.4 of the APA. Section 9.4, under Article IX "Indemnification," provides that "any claim for indemnification under this Article IX shall be brought and asserted by Buyer or Parent . . . by delivering written notice of such claim to the Indemnifying Party."[82] Section 9.4 clarifies that the Claim Notice must set forth the facts giving rise to the claim and, in the event of any claim

---

[80] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[81] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).
[82] APA § 9.4.

16

for indemnification against Sealed Air, Novipax must provide Sealed Air access to its books and records.[83] Sealed Air asserts the Claim Notice was insufficient and that it was not provided access to Novipax's books and records and seeks to dismiss the entire Complaint on this basis.

Under this same theory, Sealed Air also seeks to dismiss the breach of contract and equitable claims because Novipax did not provide Sealed Air notice of those claims within eighteen months as required under Section 9.3(a). Section 9.3(a) clarifies that no party shall be liable for an indemnification claim unless it has received notice of the claim within certain timeframes—for a fraud claim, the party must receive notice "at any time after Closing" and for "any other claim" within the "eighteen (18) month anniversary of the Closing Date."[84] Sealed Air contends it did not receive notice of the claim until Novipax filed the Complaint on March 31, 2017—long after the time to serve notice expired on October 1, 2016.

In response to the above arguments, Novipax contends that Sections 9.4 and 9.3(a) do not apply because they are under Article IX, which is entitled "Indemnification." Moreover, the language in Sections 9.4 and 9.3(a) are conditioned on a claim for indemnification. Novipax contends these indemnification provisions do not apply to this case or its claims because Novipax is not seeking indemnification. In fact, the Complaint does not mention indemnification or seek a declaration from the Court as to its right to indemnification. Instead, Novipax asserts fraud, willful misrepresentation, willful breach, and equitable claims, which are exempt from Article IX under Section 3.9(h).[85] Therefore, Novipax argues that the requirements in Sections 9.4 and 9.3(a) do not impose any prerequisites to litigation.

---

[83] *Id.*

[84] *Id.* § 9.3(a).

[85] *Id.* § 9.3(h) (explaining that indemnification rights under Article IX are the exclusive remedy for breach of any representation or warranty in the APA, but clarifying that "nothing herein shall limit (i) any claim based on fraud, willful misrepresentation or willful breach, or (ii) any party's right to seek . . . other equitable remedies").

In deciding a motion under Rule 12, the Court cannot choose between two differing reasonable interpretations of a contract. Rather, dismissal is proper only if the defendant's interpretation is the *only* reasonable construction as a matter of law. Here, the language of the APA is reasonably susceptible to different interpretations, as illustrated by the above discussion.[86] The Court, therefore, must resolve any ambiguity in favor of Novipax *at this stage* in the litigation and, on this basis, cannot grant the Motion to Dismiss on this basis.

### ii. *Sealed Air does not demonstrate that Section 5.15 is a clear and unambiguous condition precedent that bars all claims in this case*

Sealed Air next argues that Novipax did not engage in pre-litigation negotiation as required under Section 5.15 of the TSA. Section 5.15 provides that in the event of a dispute relating to an alleged breach of the TSA, the parties agree to engage in good faith negotiation to resolve the dispute.[87] If, however, the parties cannot resolve their dispute, "the Parties may then pursue their respective remedies pursuant to applicable Law and in accordance with Section 10.6" of the APA.[88] Section 10.6 of the APA permits the parties to pursue legal action for any dispute arising out of the APA.[89] Therefore, Sealed Air argues that the negotiations mentioned in Section 5.15 of the TSA are a condition precedent to litigation under Section 10.6 of the APA.

Novipax argues that Section 5.15 does not bar the claims in this case because the APA does not require negotiation prior to filing a lawsuit.[90] Moreover, Novipax contends Section 5.15 cannot be incorporated into the APA because Section 5.15 contains limiting language that it

---

[86] *Eni Holdings, LLC v. KBR Group Holdings*, *LLC*, 2013 WL 6186326, at *6 (Del. Ch. Nov. 27, 2013) ("Faced with a question of contract interpretation on a motion to dismiss, [the Court] must determine whether the contractual language at issue is unambiguous. If so, [the Court] must give effect to its meaning. If, however, the contractual language is reasonably or fairly susceptible to different interpretations, [the Court] must resolve the ambiguity in favor of the non-moving party.").

[87] TSA § 5.15

[88] *Id.*

[89] *See* APA § 10.6.

[90] *See id.*

18

applies only to a dispute or alleged breach of "this Agreement," which is defined as the TSA.[91] In addition, Section 5.15, or any other provisions of the TSA, cannot be incorporated in the APA because the parties to the two agreements are different—the APA is between all defendants in this case and the TSA is just between Novipax and Sealed Air.

Sealed Air does not demonstrate that Section 5.15 operates as a clear and unambiguous condition precedent to filing this civil action. In fact, this condition precedent is not reaffirmed or included in Article VII of the APA, entitled "Conditions Precedent."[92] Novipax in turn provides an alternative reasonable interpretation of Section 5.15. Therefore, the Court cannot dismiss the civil action in its entirety.

However, neither party addresses the fact that Novipax brings a claim specifically for breach of the TSA. While it is still unclear whether Section 5.15 is an unambiguous condition precedent, Novipax's argument seems to be that Section 5.15 applies *only* to claims for breach of the TSA. If this is the argument, then Count III may be the grounds for a counterclaim by Sealed Air. In any event, it is not a procedural bar to the litigation (like a mandatory mediation or arbitration provision).

**B. THE COMPLAINT ASSERTS A VIABLE CLAIM FOR FRAUD**

Sealed Air next argues that the fraud claim must be dismissed because it is barred by the non-reliance and integration provisions of the APA. Sealed Air also argues that the fraud claim is not pleaded with particularity and fails to demonstrate that the damages are separate from the breach of contract damages.

> ### i. *The non-reliance provision limits fraud claims to written representations in the APA*

---

[91] *See* TSA p. 1.
[92] *See* APA Art. VII.

Sealed Air first argues that the Court should dismiss the fraud claim because it is barred by the non-reliance and integration provisions of the APA. According to Sealed Air, these provisions bar Novipax from claiming it reasonably relied on any alleged misrepresentation or omission by Sealed Air outside of those representations and warranties specified in the APA.

Article IV of the APA pertains to Sealed Air's representations and warranties about the Business. Section 4.5 requires Sealed Air to represent and warrant that there has not been any Material Adverse Effect, that the Business has been operated in the Ordinary Course, and that it has not taken any action before the Closing that would constitute a breach of the covenants provided in Section 6.1.[93] Section 4.6(b) then requires Sealed Air to represent and warrant that there is no material default of any Material Contract and that Sealed Air has not received notice of any party's intention to terminate any such Material Contract, which includes supply agreements with certain key customers of the Business.[94] Finally, Section 4.18 requires Sealed Air to represent and warrant that "in the last 12 months, no Major Customer has provided written notice to Sellers of its intention to terminate its relationship with any Seller with respect to the Business, whether as a result of the Transaction or otherwise."[95]

Sealed Air relies principally on the purported non-reliance and integration provisions Sections 4.20, 5.7, and 10.3 of the APA to make its argument. Section 4.20 provides that, except as set forth in Article IV (the representations and warranties of Sealed Air):

> [N]ONE OF THE SELLERS, THEIR RESPECTIVE AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF SELLERS, THEIR RESPECTIVE AFFILIATES OR THE BUSINESS.[96]

---

[93] *See id.* § 4.5.
[94] *Id.* § 4.6(b).
[95] *Id.* § 4.18.
[96] *Id.* § 4.20.

20

Section 5.7, under the heading "Representations and Warranties of Buyer" reaffirms this same

principle:

> Buyer is not relying on any representations, warranties, omission or covenants of Sellers or any of their Representatives (including any financial statements not expressly covered in Section 4.4, any projections, and the information contained in the confidential information memorandum, management presentation and other due diligence materials made available to Buyer) except as expressly set forth in this Agreement and any Seller Related Agreement executed and delivered to any Buyer Party pursuant to this Agreement.[97]

Finally, Section 10.3 provides that the APA and accompanying Schedules, Exhibits, and

Annexes and other agreement contemplated by the APA "collectively constitute the entire

agreement among the parties and supersede any prior understanding, agreement, or

representations by or among the parties."[98]

Sealed Air argues that these provisions preclude all of the alleged misrepresentations and

omissions cited in the Complaint because they all occurred prior to closing or outside the

Agreement. For example, Sealed Air alleges that Novipax's reliance on statements in the

management presentations and Confidential Information Memorandum is expressly barred by the

language of Section 5.7. Sealed Air relies on a number of Delaware cases to argue that these

express non-reliance provisions bar any claim based on extra-contractual fraudulent

misrepresentations.[99]

In response, Novipax argues the Sections 4.20, 5.7, and 10.3 do not bar the fraud claim

because Section 9.3(h) expressly preserves fraud claims. As previously discussed, Section

9.3(h), in the Article entitled "Indemnification," provides that the indemnification rights

---

[97] *Id.* § 5.7.
[98] *Id.* § 10.3.
[99] *See e.g.*, *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35 54–55 (Del. Ch. 2015) (Representation-limiting language defines the universe of information on which the contracting party relied. If the contract says the buyer only relied on the representations in the four corners of the agreement, then that is sufficient).

provided by Article IX shall be the "sole and exclusive remedy" for any breach of representations, warranties, or covenants in the APA.[100]  However, Section 9.3(h) qualifies that remedy by stating, "nothing herein shall limit (i) any claim based on fraud, willful misrepresentation, or willful breach, or (ii) any party's right to seek . . . other equitable remedies."[101]

Novipax relies on *Anvil Holding Corp. v. Iron Acquisition Co. Inc.*[102] to argue that its fraud claim is cognizable in spite of the non-reliance provisions.[103]  In *Anvil*, the Delaware Court of Chancery declined to dismiss a fraud claim based on the non-reliance provisions of an agreement for two reasons.[104]  First, the *Anvil* court found that the non-reliance provisions did not unambiguously demonstrate that *both parties* disclaimed reliance on extra-contractual statements.[105]  Instead, the non-reliance provisions at issue merely stated that neither the seller nor any of its representatives was making extra-contractual representations.[106]  Second, the *Anvil* court found that the "exclusive remedies" clause, in which the parties agreed to reserve all rights to claims based on fraud, preserved the fraud claim.[107]  The exclusive remedies provision thus provided further evidence that the parties intended that fraud claims could be based on extra-contractual representations.[108]

Novipax also relies on *Airborne Health, Inc. v. Squid Soap LP*.[109]  In *Airborne*, the Delaware Court of Chancery found that an asset purchase agreement did not contain a non-

---

[100] APA § 9.3(h).
[101] *Id.*
[102] 2013 WL 2249655, at *1 (Del. Ch. May, 17, 2013).
[103] *Anvil*, 2013 WL 2249655, at *1.
[104] *Id.* at *8.
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] 984 A.2d 126 (Del. Ch. 2009).

reliance provision that barred a fraud claim. [110] The *Airborne* court found that an integration clause could not form the basis for a non-reliance provision because that clause was standard in most contracts and did not contain any language resembling anti-reliance.[111] The *Airbone* court also found that the exclusive remedy provision preserved the fraud claim and that, absent any limit on that fraud claim through a non-reliance provision, extra-contractual representations were allowed.[112]

The facts of this case lie somewhere in between *Anvil* and *Airborne*. Here, unlike *Anvil* and *Airborne* both parties expressly represented in Sections 4.20 and 5.7 that they were not relying on any extra-contractual representations.[113] Section 10.3 is a standard integration clause that should not be considered a non-reliance provision. However, as in *Anvil* and *Airborne*, the parties also included an exclusive remedies provision and expressly provided that fraud and other equitable claims were reserved. In this instance, the non-reliance provision likely places a limit on the types of fraud claims that can be brought to those based on written representations in the APA. As *Airborne* explained, "when drafters specifically preserve the right to assert fraud claims, they must say so if they intend to limit that right to claims based on written representations in the contract."[114] Therefore, *at this stage of the proceedings*, the Court finds that the parties preserved a fraud claim in Section 9.3(h), but limited that fraud claim through the non-reliance provisions in Section 4.20 and 5.7 to written representations in the APA.

---

[110] *Airborne*, 984 A.2d at 140–41.
[111] *Id.* at 141.
[112] *Id.*
[113] *See* APA §§ 4.20, 5.7.
[114] *Airborne*, 984 A.2d at 141.

***ii. As alledged, the representations relied upon are intra-contractual, however, to the extent that Novipax is relying on extra-contractual representations, those are barred by the non-reliance provisions***

Novipax's alternative argument is thus that that Sections 4.20, 5.7, and 10.3 do not bar the fraud claim because each of the representations it relied upon were intra-contractual or based on the written representations in the APA. A fraud claim can be based on representations found in a contract.[115] However, as discussed more fully below, the allegations of fraud must be separate from the breach of contract claim.[116] Allegations that are focused on *inducement* to contract are separate and distinct conduct.[117]

Here, Novipax alleges that Sealed Air fraudulently induced it into closing the transaction. In making this argument, Novipax relies on the representations, warranties, and covenants contained in Sections 4.5, 4.18, 6.1, and 6.3. Under these sections, Sealed Air represented, warranted, and covenanted to perform certain functions related to the Business and to make certain disclosures about the Business prior to the Closing. For example, Sealed Air represented that it has operated the Business in the Ordinary Course and that there has not been any Material Adverse Effect.[118] Additionally, Sealed Air represented that no Major Customer had provided written notice of its intent to terminate the relationship with the Business for any reason.[119] Moreover, Sealed Air covenanted to conduct the Business in "all material respects in the Ordinary Course" and to use its best efforts to "preserve intact its current business organization" and "maintain its existing relationships with customers, suppliers, vendors, distributors, and

---

[115] *ITW Glob. Invest. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908, at *5 (Del. Super. June 24, 2015).

[116] *Id.* at * 6.

[117] *Id.*

[118] APA ¶ 4.5.

[119] *Id.* ¶ 4.18.

24

agents having business dealing with them."[120]  Finally, Sealed Air covenanted to provide written notice to Novipax if any representation became untrue or if it failed to comply with any of its covenants."[121]

Despite these representations, Novipax alleges that Sealed Air affirmatively worked to harm the Business by helping certain customers migrate from foam trays to rigid trays.[122] Novipax alleges that Sealed Air concealed its conduct, as well as information regarding the viability of the Business and customers such as Tyson and Perdue's intent to switch from foam to rigid trays.[123]  Instead of alerting Novipax to this change, however, Sealed Air represented in the closing certificate that all of the representations and warranties contained in the APA are true and correct as of the date of the closing certificate.[124]  Sealed Air also represented that it performed in all material respects the covenants and agreements in the APA.[125]  Therefore, Novipax contends that the representations in the APA, and Sealed Air's attestation to those representations, fraudulently induced Novipax into closing the transaction.

The facts of this case are similar to the facts in *Abry Partners V, L.P. v. F & W Acquisition, LLC*.[126]  In *Abry*, the parties entered into a Stock Purchase Agreement (the "Agreement") for the buyer's purchase of a portfolio company.[127]  The Agreement contained several representations and warranties about the company's financial statements.[128] After the parties entered into the Agreement, the buyer discovered that the financial statements prior to the

---

[120] *Id.* ¶ 6.1.
[121] *Id.* ¶ 6.3(b).
[122] Compl. ¶¶ 52–64.
[123] *Id.*
[124] *See id.* Ex. W.
[125] *Id.*
[126] 981 A.2d 1032.
[127] *Abry*, 981 A.2d at 1034–35.
[128] *Id.*

25

Agreement were fraudulently manipulated by the buyer.[129]  The Court of Chancery refused to dismiss the fraudulent inducement claim, finding that the "financial statements were represented and warranted in the Agreement and were therefore intended to induce the Buyer to sign the Agreement and close the sale to purchase the Company."[130]

Here, Novipax points to representations in the APA about how Sealed Air was to conduct the Business and about the financial viability of the Business before the Closing, including the Business's Major Customers.  However, after the parties closed the transaction, Novipax learned that those representations were false, and that Sealed Air did not correct the misrepresentations before the Closing in an attempt to induce Novipax into closing the transaction.  This is sufficient to support a claim for fraudulent inducement at this stage in the litigation.

To the extent, however, that Novipax is relying on extra-contractual misrepresentations, those misrepresentations are barred by the non-reliance provision, as well as, other express provisions in the relevant agreements.[131]  It appears that Novipax is relying on certain statements made by Sealed Air outside the APA.  In paragraphs 51–57 of the Complaint, Novipax cites to false assurances provided by Sealed Air that the Business constituted a viable, sustainable product line.[132]  However, Novipax doesn't allege that these representations are contained in the APA.  Rather, Novipax relies on representations made by Sealed Air in the Confidential Information Memorandum and the management presentation.[133]  Both of these documents are expressly excluded under the non-reliance provision in Section 5.7.

---

[129] *Id.* at 1038–40.
[130] *Id.* at 1051.
[131] *See ITW Glob. Invest. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908, at *5 (Del. Super. June 24, 2015) (permitting a fraudulent inducement claim based on representations contained in the parties' agreement, but excluding a fraudulent inducement claim based on representations made outside the agreement).
[132] Compl. ¶¶ 51–57.
[133] *Id.* ¶¶ 53–56.

26

### ii. *The Fraud Claim is pleaded with the requisite particularity including the claim for damages*

Sealed Air also attacks the fraud claim on the basis that it is not pleaded with particularity and is not separate from the breach of contract damages.

As to the first argument, it is abundantly clear that the Complaint pleads fraud with the requisite particularity, and this opinion will not highlight each specific fraud allegation made. Generally, however, the Complaint alleges that: Defendants made material misrepresentations,[134] that Novipax justifiably relied on those misrepresentations,[135] that Sealed Air knew the representations were false or made them recklessly and with the intent to deceive Novipax,[136] that Novipax was fraudulently induced into the transaction,[137] and that Novipax suffered damages as a result.[138]

As to the second argument, Sealed Air argues that Novipax is attempting to "bootstrap" its fraud claim to a breach of contract claim because the fraud damages are not separate and apart from the breach of contract damages. Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action.[139] The damages allegations, however, may not simply rehash the damages allegedly caused by breach of contract.[140] Moreover, plaintiff cannot "bootstrap a claim of breach of contract into a claim for fraud by alleging that a contracting party never intended to

---

[134] *See e.g.,* Compl. ¶¶ 5, 6, 32, 33, 46–53, 55, 57–59, 65, 66, 68, 71, 94, 103, 104, 110, 118–20, 125, 135, 136, 155.
[135] *Id.* ¶¶ 112–16, 121, 122, 127, 128, 147, 165.
[136] *Id.* ¶¶ 29, 47–50, 58–62, 68, 71–73, 76, 77, 90, 91, 96–99, 102–09, 111, 112, 118–20, 125, 126, 133.
[137] *Id.* ¶¶ 86, 101, 116, 119, 121,122, 165.
[138] *Id.* ¶¶ 167, 170, 171.
[139] *ITW Glob. Invest. Inc.,* 2015 WL 3970908, at *5.
[140] *Id.*

perform its obligations."[141] In other words, plaintiff cannot adequately state a fraud claim merely by adding the term "fraudulently induced" to a claim for breach of contract.[142]

Here, at this point, the Court does not find that Novipax is trying to "bootstrap" a fraud claim to a breach of contract claim. In fact, the principal claim in the Complaint is for fraud and fraudulent inducement that renders the APA void. The breach of contract claim is an alternative remedy. Novipax alleges that it obtained contractual representations and covenants to ensure that the Business, including stability of customers, still existed at the Closing.[143] Sealed Air, however, purportedly misrepresented and concealed information regarding the viability of the Business, including obstacles to customers converting to rigid trays, and Sealed Air's facilitation of customer migration to rigid trays, before the Closing in order to induce Novipax to purchase the Business.[144] These allegations, if true, go beyond a mere intention not to comply with the terms of the Agreement. As such, at this juncture, the fraud claim is different from the breach of contract claim.

While the two claims are different, Seal Air is correct that Novipax pleads damages that are similar for both claims.[145] However, Novipax prays for rescission of the transaction or recessionary damages, which is a remedy for fraud.[146] This Court has twice held that a claim for rescission or recessionary damages separates a fraudulent inducement claim from breach of contract damages.[147] Nonetheless, if discovery demonstrates that Novipax's damage claims for breach of contract and fraud are the same, the Court can revisit the issue prior to a trial.

---

[141] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010).

[142] *Id.*

[143] Compl. ¶¶ 30–40, 66–86

[144] *Id.* ¶¶ 47–50, 54–64, 87–91, 92–114, 117 –124.

[145] *See id.* ¶¶ 167, 175, 179.

[146] *See id.* VI.3.

[147] *See ITW Glob. Invest. Inc.*, 2015 WL 3970908, at *6 ("Count I for fraud must be dismissed because it pleads damages that are simply a "rehash" of the breach of contract damages. Because Count II for fraud in the inducement pleads damages for rescission or rescissory damages, the Court will not address Count II."); *see also EZLinks Golf, LLC v.*

**C. THE COMPLAINT ASSERTS FACTS WHICH, IF TRUE, SUPPORT A CLAIM FOR BREACH OF THE APA AND TSA**

Sealed Air next seeks to dismiss the breach of contract claims. Sealed Air argues that Novipax has not alleged any facts that demonstrate that Sealed Air breached any provision of the APA and TSA. This is not true.

Similar to the basis for Novipax's fraud claim, Novipax argues that Sealed Air breached the representations, warranties, and covenants in Sections 4.5, 4.18, 6.1, and 6.3 of the APA. As it relates to the representations, the Complaint alleges that Sealed Air breached the representation in Section 4.5 that there has not been any Material Adverse Effect and that the Business has been operated in the Ordinary Course.[148] The Complaint cites to e-mails from several Sealed Air employees acknowledging that customer preference is moving away from foam trays and that the cost to convert specialty production lines from foam trays to rigid trays was *de minimus*.[149] In addition, the Complaint alleges that Sealed Air breached Section 4.18 when it represented that in the last 12 months, no Major Customer had provided written notice to Sealed Air of its intent to terminate its relationship with any Seller with respect to the Business.[150] The Complaint alleges that Sealed Air knew of Cargill and Perdue's intent to migrate away from foam trays, but that this intent was never disclosed to Novipax.[151]

As it relates to the covenants, the Complaint alleges that Sealed Air breached Section 6.1 because it was not "Ordinary Course" to migrate the Business's customers such as Cargill and Perdue to non-Business products.[152] Moreover, this conduct did not amount to Sealed Air's

---

*PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 (Del. Super. Mar. 21, 2017) (finding that plaintiff's count for fraud in the inducement is materially identical to the breach of contract complaint and rejecting plaintiff's reliance on *ITW* because plaintiff pleads neither for rescission or rescissory damages as did the *ITW* complaint).

[148] Compl. ¶¶ 71–73.
[149] *Id.* ¶¶ 47–49; 71 –74.
[150] *Id.* ¶¶ 78–80.
[151] *Id.* ¶¶ 80–82.
[152] *Id.* ¶ 66.

"reasonable best efforts to preserve intact the Business" or Sealed Air's maintenance of "existing relationships with customers," including the Major Customers such as Cargill and Perdue.[153]  In addition, the Complaint alleges that Sealed Air breached the covenant in Section 6.1 by failing to "maintain all of the Purchased Assets" in their current condition.[154]  The Complaint contends that Sealed Air breached this covenant because it actively transitioned patronage to their rigid tray business, which harmed the Business and devalued the goodwill that Novipax acquired.[155]

Finally, as it relates to the TSA, the Complaint asserts minimal, but sufficient facts to support breach of the TSA.  The Complaint alleges that under the TSA, Sealed Air agreed to provide specific transition services to Novipax after the Closing so that Novipax could receive the full benefit of its Purchased Assets.[156]  The TSA sets forth Sealed Air's commitment to assist in maintaining existing customer relationships in Service Schedule 1, A and to provide sales administrative support for formula pricing and U.S. barrier foam tray pricing in Service Schedule 1,B.[157]  Based upon Sealed Air's conduct and its statements in various e-mails of Sealed Air employees, Sealed Air breached these provisions of the TSA, specifically by attempting to improperly transition barrier foam trays to the rigid trays sold by Seller.[158]

The Court need not address each allegation in support of the breach of contract claims. At this stage in the litigation, the Court must accept all well-pleaded allegations as true.  Sealed Air can argue that its conduct did not breach the APA or TSA, but Novipax alleges that Sealed Air's pattern of conduct before the Closing demonstrates that Sealed Air *did* breach the APA and TSA.  The Court must construe these allegations and the inferences to be drawn therefrom in the

---

[153] *Id.*
[154] *Id.* ¶ 67.
[155] *Id.*
[156] *Id.* ¶ 40.
[157] *Id.* ¶¶ 40, 145.
[158] *Id.* ¶¶ 145–147.

light most favorable to Novipax. In doing so, the Court finds that the allegations, if true, support a claim for breach of contract, specifically Sections 4.5, 4.18, 6.1, and 6.3 of the APA and Schedule I, A, and Schedule I, B of the TSA. Therefore, the Court will not dismiss Counts II and III for breach of contract. As discussed previously, however, the claim for breach of the TSA may be barred by Novipax's failure to engage in pre-litigation negotiation as provided in 5.15, but the briefing is not clear on this point.

**D. THE EQUITABLE CLAIMS FOR UNJUST ENRICHMENT AND DECLARATORY JUDGMENT ARE, AT THIS TIME, COGNIZABLE**

As a final argument, Sealed Air seeks to dismiss the equitable claims for unjust enrichment and declaratory judgment.

### i. *The unjust enrichment claim is a viable alternative remedy at this stage in the litigation*

Sealed Air argues that Novipax cannot recover for unjust enrichment because the APA governs the relationship between the parties. In other words, Sealed Air argues that Novipax cannot maintain both a cause of action for breach of contract and unjust enrichment. Sealed Air is correct; however, Novipax is asserting the two claims as alternative, not parallel, claims for relief.[159] The principle claim in this case is for fraud and fraudulent inducement. Sealed Air argues that this fraudulent inducement renders the APA void. A claim for unjust enrichment may thus proceed under the theory that no valid contract exists. The breach of contract claim is an alternative theory of relief. Therefore, the Court will not dismiss the unjust enrichment claim, but Novipax must eventually decide under what theory it wishes to proceed—fraud and unjust enrichment or breach of contract.

---

[159] *Avantix Labs, Inc. v. Pharmion, LLC*, 2012 WL 2309981, at *9 (Del. Super. June 18, 2012).

### ii. *The declaratory judgment claim is appropriate based on the relief sought in this case*

Novipax seeks declaratory judgment as to the purchase price adjustment mentioned in Sections 3.3 and 3.4 of the APA. Specifically, Novipax seeks a declaration that there is no remaining claim by Sealed Air for any adjustment amount due to Sealed Air. Alternatively, should the claim remain, Novipax seeks a declaration that it is entitled to a set off its damages in this case with any working capital obligation that Novipax might owe Sealed Air.

Sealed Air argues that declaratory judgment as to setoff is improper because any disagreement pertaining to working capital adjustments must be resolved by an accounting referee under Section 3.4(d) of the APA. Sealed Air contends that declaratory judgment is improper because it would negate Section 3.4(d)'s requirement that these disputes be resolved via binding ADR.

Section 3.3. states that at the Closing, Novipax will pay Sealed Air an amount equal to $80,000,000, which is the purchase price.[160] The purchase price, however, may be adjusted by adding the Estimated Working Capital Adjustment to that amount.[161] The Estimated Working Capital Adjustment equals the difference between the Closing Net Working Capital and the Base Net Working Capital.[162] At least three days prior to the Closing, Sealed Air must deliver to Novipax a certificate setting forth Sealed Air's calculation of this Estimated Working Capital Adjustment, which shall be used to determine the Adjusted Purchase Price payable at the Closing.[163] If, however, Novipax disputes Sealed Air's calculation of the Closing Net Working

---

[160] APA § 3.3.
[161] *Id.*
[162] *Id.* p. 6.
[163] *Id.* § 3.4(a).

Capital, Novipax may deliver to Sealed Air a certificate setting forth its calculation of the closing Net Working Capital.[164]

If Sealed Air then contests in good faith Novipax's calculation, it may deliver notice to Novipax of its calculation of the Closing Net Working Capital.[165] If after all this, Sealed Air and Novipax still disagree on the amount, they must retain an accounting referee to resolve all disputed items or amounts and to calculate the Closing Net Working Capital.[166]

Novipax argues that Section 3.4(d) does not bar the declaratory judgment claim because Novipax is seeking to rescind the APA. In other words, Sealed Air's fraud vitiates its right to rely on any provision of the APA to bar Novipax's claims. Since the Court is permitting the fraud claim to go forward, the declaratory judgment claim is also cognizable at this time.

While not argued by the parties, it does not appear that Novipax's request for declaratory judgment even implicates Sections 3.3 and 3.4. Novipax appears to seek a declaration only as to Sealed Air's right to make a claim for an adjustment amount. If true, then this is an issue for the Court to determine in the first instance. This is not a dispute between the parties over the Closing Net Working Capital that must be resolved by an account referee.

## V. CONCLUSION

For the reasons set forth above, the Court will **DENY** the Motion to Dismiss. The Court understands this to be a large sales transaction between sophisticated parties. Those parties were represented by quality lawyers. The various agreements were extensively negotiated and the provisions, even ones characterized as "boilerplate," have to be enforced as intended by the parties when they negotiated the sales transaction. The Court believes that appropriate discovery

---

[164] *Id.* § 3.4(b).
[165] *Id.* § 3.4(c).
[166] *Id.* § 3.4(d).

33

should allow the parties to narrow the issues in this case leading up to dispositive motions and/or trial.

Dated: November 28, 2017
Wilmington, Delaware

/s/ Eric M. Davis
Eric M. Davis, Judge